Good morning, Chief Judge, Your Honours, Police, the Court. As Your Honours are aware, there are many different issues that are raised by the parties in the Appeal and Cross-Appeal, and I'd like to begin by addressing the validity of Claim 12, the 913 patent, and then to move on to the issue of the induced infringement claim with respect to the 450 patent family, and then finally finish with the consisting, essentially, of finding by the District Court of indefiniteness, unless Your Honours prefer that I address the issues of a different order. Your Honours, we request that this Court affirm the District Court's finding of validity of the 450 patent family. Thank you, Your Honours, and I'd like to move on to Claim 13, which is a threshold question. Would you agree that the issues concerning impurity A, the formulation degrades by less than 1% over six months, and consisting, essentially, of that they rise and fall together? No, Your Honour, we would not agree with that. There are a lot of different issues that are packed in together there. There was a claim term at issue that recited a degrades claim term. There's also a separate claim term to impurity A. Those are actual terms of the claim. The consisting, essentially, of argument relates to the basic and novel properties, and we view those as a separate argument, although the District Court judge did, in our view, improperly import the discussion of the claim construction analysis indefiniteness into the assessment of the definiteness of basic and novel properties. But if the impurity is indefinite, then how can degradation be definite? Well, it depends, Your Honour, on what aspect of degradation we're looking at. If degradation is a claim term, then that's a separate analysis, in our view, from assessing improved stability, which the District Court identified as a basic and novel property. But if you can't show impurity A, how can you show that there's been a degradation? Well, in the context of basic and novel property, that relates to a factual inquiry concerning infringement. The basic and novel properties are identified to aid the factfinder in considering this hypothetical infringement question, where you have a composition which is the claimed composition that includes some additional component. So the basic and novel properties are set forth so that the factfinder can evaluate whether that additional component materially affects that property. So that's really an assessment of similarity. This is not subject to the same kind of objective requirement that you have, you know, it's not a claim term that requires an objective means of evaluating, because it's a very different type of analysis. Basic and novel properties are not part of the claim language. They're simply identified based on the intrinsic evidence to assist the factfinder in evaluating the factual question of infringement. So it's our position that, in this case, the District Court erred because he blurred the line between the factual inquiry, which relates to the basic and novel properties, and the legal question of determining the scope of the claim. He properly recognized consisting essentially of is a legal term of art. He recognized that since the parties disputed the identification of the basic and novel properties, that he needed to go and look at the intrinsic record, and as a matter of law, determine what were the basic and novel properties. This Court has never held that it's appropriate to consider definiteness of the basic and novel properties. Well, we haven't held either way, so maybe it's just a new question. We haven't held to the contrary, right? That's correct, Your Honor. This question is a case of first impression that has not come to this Court. Aren't basic and novel properties part of the claim scope? I disagree, Your Honor. The basic and novel properties come out of the patent examination group originally. It was brought in by the CCPA simply as a context of the factual question. This Court, in the PPG case, recognized that there is a line that should be maintained. What factual question? We're talking about what the claim says and what it covers. Well, the basic and novel properties are to be used to assess in the specific factual question where you have a composition in this case which would meet all of the limitations of the claim, but contain one additional component, and the existence of this additional component would materially affect that basic and novel property. There's no absolute value that's to be targeted here. It's a question of similarity. That's something for the fact finder to determine whether the party who is advancing that information has met their burden of proof. How can we tell as to the formulation of a patent? It would be a justification to reduce the number of basic and novel properties that are recited. I'm sorry, Your Honor, I didn't understand your question. The formulation has a multitude of properties. That's correct, Your Honor. Okay, and then you want to show, I need to have some guidance, I need to see some guidance as to which one of the multitudes are the basic and novel properties. Well, the District Court properly found, based on the intrinsic record, that there were several different properties that the inventors identified clearly in their specification as those properties which distinguished the invention from the prior art. I realize in Activist's brief they argue there are other properties that were discussed in the intrinsic record, but we submit there's a clear distinction between those properties which the inventors set out as being the basic properties which differentiated the invention from the prior art, and then other properties which could flow from those basic properties. I don't see that distinction in the patent. Well, for example, Your Honor, one of the basic and novel properties the Court found is improved or higher viscosity. And then there's some other properties relating to ease of spreadability. That's a property that flows from the basic and novel property of the higher viscosity. And that's the case for many of the additional properties that Activist, in its brief, suggests should also be considered basic and novel properties. There's no error in the Court's evaluation of what are the basic and novel properties, because the specification quite clearly identifies those properties as being the ones that constitute the improvement of the invention as compared to the prior comparative liquid composition. Wait, so there are three indefinite terms here, so maybe I'm confusing the two. But what the District Court said was that the basic novel properties were not, they didn't meet the novelist test because the better drying time was also an indefinite term? That's correct, Your Honor. The District Court, in our view, improperly found that the better drying time term was indefinite in large part because the District Court... Was indefinite or definite? Was indefinite, not definite, because the District Court, without actually ever receiving any argument or testimony on the question of that as a basic and novel property, the District Court improperly looked at evidence submitted to the Court in the context of claim construction, not relating to the basic and novel property of drying time, but relating to the claim term of drying rate. And that was error for the District Court to try to rely on arguments and information concerning drying rate to support a finding that improved drying time is a basic and novel property. Okay, we've got so many tiers here, I'm getting very confused. The District Court found that consisting essentially of was indefinite. What is your main argument as to his conclusion? So, there are multiple levels because there are so many issues, but the main argument is that it was improper to even subject the basic and novel properties to the requirements of Section 112. How was he to construe them, consisting essentially of? Well, consisting essentially of has been well accepted as a legal term of art, which has an accepted meaning, and to the extent that it includes all the recited elements and can permit the inclusion of additional elements which do not materially affect the basic and novel properties. So as part of his claim construction, he had to find out whether or not it affects the factual question. And the irony is that in this case, that factual question was never raised before the District Court judge because in this case, activist's formulation did not contain any additional ingredients. It included all of the recited components and no more. So, that's part of the problem here is that activists raised this not because they had trouble knowing whether or not they infringed the claim, but because they saw this as an responsibility for your own claim, and it doesn't say consisting of, it says consisting essentially of, and the District Court is obligated to do a claim construction of that, right? That's correct, and the District Court did properly recognize it as a legal term of art, and because the parties did not agree on the identification of the basic and novel properties consistent with this court's precedent, it was appropriate that the District Court identify those basic and novel properties so that there was no confusion about what are the properties that should be evaluated in that factual context. Okay, and did we all agree, did everyone agree that better drying time is one of the basic novel properties? Well, Your Honor, I believe activists disputes that. Activists in its briefing and the District Court suggested that there was insufficient evidence in the record to even allow the District Court to determine the basic and novel properties. We submit that the District Court did not commit any error in its identification of the properties. The error came... There's other issues that we're probably going to move to, but before we do, I just want you to address again, how is a procedure supposed to reasonably identify the impurity A? So just focusing on the claim term of impurity A, the impurity A, the specification is silent on the identification of impurity A. It's not there, and when the intrinsic record is silent, it's appropriate to look at extrinsic evidence in the form of pharmacopoeias from every country that clearly set out all of the known impurities of diclofenac, and those are, it's well known to... So the patent encompasses all of those different citations? Isn't that indefinite? Well, no, Your Honor, because in the specification, they reference it as impurity A, and the person with skill in the art would have known that impurity A refers to the known impurities, and A is the first listed. They're alphabetical. It's the first listed because it is the primary degradant of the active ingredient. In the context of pharmaceutical formulations, the concern is always with degradants of the active... So was there expert testimony to this effect? Yes, there was, Your Honor, and in fact, both experts agreed that at the time of the filing of the application, that the person with skill in the art would have been aware of that information. So we submit that it was error, that the district court... Aware of what information? Do the experts agree that the citation to A here is necessarily governed by what existed in the extrinsic evidence? Well, both experts agreed that a person with skill in the art would have been aware of the available pharmacopoeias, which listed all of the known impurities by letter, that there was an impurity called impurity that was labeled A. What activists as experts tried to suggest is that somehow, because the specification didn't identify impurity A, that that somehow rendered it ambiguous. We submit that that was not a proper analysis of the intrinsic record, and this court can review that de novo. We believe that it was proper to see that there was no definition of impurity A in the specification, and then to consult the available extrinsic evidence, which the experts agreed identified the known impurities of diclofenac, including one that was called A. Ken, I think this may be what Judge Reina started with, but maybe not, is that if we disagree with you on impurity A, does that necessarily dictate that the district court was also correct in the degradation construction? Well, no, Your Honor. I mean, first of all, the district court found that the improved stability basic and novel property... Well, let me just make sure I understand your question. Are you asking about the claim term degrades? Yes. Okay, so with respect to the claim term degrades, we argue that in the context of how that term is used, because it specifically recites a percentage and a time frame, that a person with a skill in the art would have known that that references example six of the specification, which relates to impurity A. So those two do stand and fall together. So if we conclude that you're wrong on impurity A, i.e., that term is indefinite, then the second question on degradation goes down, too? With respect to the claim term, and that's why I wanted the clarification, because there's also, in our view, an improper conflation of the claim term degrades, which we argue related to impurity A, and the basic and novel property of improved stability, which the district court, without any evidence at all in the record, found was indefinite because, in our view, the district court judge improperly bootstrapped from a basic and novel property of improved stability all the way down to impurity A. And there was no evidence at all to support the district court's opinion. Can you address the induced infringement issue? I'm sorry? The induced infringement issue? Yes, I'm happy to address that. We submit that the district court erred in granting activists' motion for summary judgment. We believe that activists' proposed labeling does instruct users to infringe the 450 patent family. Specifically, the activist label includes an instruction to avoid sun exposure, to be careful about UV rays because of risk of skin cancer, and then provides a very specific series of instructions to apply the topical, to wait for it to dry, and then to subsequently apply the sunscreen. And in the district court's opinion, granting the motion for summary judgment, the judge accepted— I don't understand what you just said. The language says the label—I don't understand how the label encourages the application of sunscreen. It just says that if you apply it, wait until the area is dry. How is that a matter that would come within our jurisprudence in terms of what's required for inducement? Well, in the AstraZeneca v. Apotex case, this court held that where a label instructs a user, includes instructions that will inevitably cause some users of the product to infringe, that that's sufficient to find for induced infringement. And in this case, the district court judge accepted that given the instructions in activists' labeling, that some users of the product would inevitably infringe. And that's because it warns about sun exposure and then instructs you to apply the formulation and then to wait for it to dry before putting on any other topical. That may be true, the instruction may lead to infringement, but the instruction is not a mandate or an imperative to apply. That's correct, Your Honor, that users of the product could choose a non-infringing use, but this court has recently in the Bandit decision made clear that the existing of a non-infringing use is not a defense to induced infringement. And here, because the instructions in the labeling, as the district court accepted, would inevitably lead some users of the product to infringe under this court's precedence, specifically I think it's very analogous to the AstraZeneca v. Apotex case, that that is sufficient to find induced infringement. In AstraZeneca, it was a claim to one's daily administration. There was nothing in the labeling that said anything about one's daily administration, but this court found that there was induced infringement because they found that there were instructions regarding... that do not wait for six hours until you operate a motor vehicle. Are we thinking that that is instructing someone to go out and drive a car six hours later? Well, I mean, if it's an instruction as it is in this case, it's not just a caution, it's a clear instruction in Section 2. Well, take my hypothetical. If it says take one pill and do not use a motor vehicle until six... do not drive until six hours after that, is that instructing someone to drive at the six-hour moment? Well, obviously there's a fact question of whether that instruction would inevitably cause some users to infringe, but to the extent that that is found, which in this case the district court... So you think that kind of label is an instruction that somebody needs to go out and drive six hours after they take the pill? If it says take this pill, wait six hours before driving, then yes, it's providing an instruction on how to safely take the product and how to safely use a motor vehicle after ingesting the product. And in this case, there was a medical need to avoid sun exposure because of the risk of skin cancer. You can avoid sun exposure in a multitude of ways. The most easy one is to stay inside. That's correct, but in this case, the labeling specifically addresses the safe use of sunscreen, and that instruction is in the labeling because the district court... recognized that application of sunscreen was something that was a likely event to occur, and they actually are the ones that required that this instruction be included in the labeling because they anticipated that users would need to apply sunscreen. I see that I'm out of time. Okay. We'll reserve some rebuttal for you. Thank you. Okay. Thank you. Good morning, Chief Judge, and may it please the Court. I'd like to start with the cross-appeal issue. The district court found every fact in activists' favor. He found that people knew of PenCid 1.5's drawbacks. He found that people knew of the components that would improve those drawbacks. He found the exact ranges of those ingredients were found in the prior art, and he found that every one of those things flowed logically from the prior art. So in the face of all those factual findings about all this stuff that was in the prior art, he made two legal errors that led to a finding of non-obviousness. First, he used the general unpredictability of the art as a thumb on the scale. So after finding, in fact, that people knew exactly what ranges to use for these components, he said, but the general unpredictability of the art would trump that. And that's error. Second, he... Well, he said a little more than that. I mean, he went through in detail the testimony of the experts, and certainly if he had credited your expert, we wouldn't be — you wouldn't be here. Your friend wouldn't be here arguing about this. Right. But given the deference that is owed, he went through the experts, and he essentially concluded, and it's a factual question, whether or not this was an unexpected result. He looked at all the combinations. He rejected the notion it's like a stereo where you have six buttons and they operate independent from each other. I mean, it's just hard, is it not, for us on review here, you know, to dislodge his conclusions, which are heavily based on what the expert said. That's not quite correct, Your Honor, because the key thing to understand is he didn't find any unexpected results. The key thing is he said there might have been unexpected results. So he didn't actually go through and say, oh, this is an interesting amount of ethanol to use. Oh, this is a — who knew that you could use this amount of thickener? He didn't find any of that. He said rather, and this is at A15932, the appendix, he said, the testimony establishes, quote, it might not always work as predicted when a complex topical formulation attempts to drive inactive ingredients across human skin. The point being, though, is it turns out all the ingredients did exactly what they were supposed to do. There was no actual finding of unexpected results. And that's the problem. He rather took the generalized notion that this is a complex area and said theoretically things could have interacted in some weird way. The thing about that is that is insufficient under this Court's case law. You can't just look at a general unpredictability in the field to you to say that there is not obviousness. Because if you did that, you would change the requirement that there be some reasonable expectation of success into the requirement that there be an absolute guarantee of success. So if you do that, no pharmaceutical product would ever be patentable? If — On this theory? No. If you adopted the district court's reasoning, every complex pharmaceutical problem would always be non-obvious. And no matter how small the change is, because of course there's some chance in the world that if you, for example, increase the amount of ethanol, there could be some problem with that. But the law doesn't require that there be an absolute knowledge of what's going to happen ahead of time. Rather, after KSR, there's only the requirement that people have an understanding of what is likely to happen, what is a reasonable chance of expectation of success. And that's — and the facts all back that up. The district court said if you add ethanol, it's expected that you'll decrease drying time. If you add the specific amount of HPMC, if you add the specific amount of thickener, that you'll actually thicken the formula. And that's what happened. They did exactly what was in the prior art, within the range of the prior art, and it turned out it worked just like everybody thought it would. If no one else had done it, your client didn't do it, where does one second-guess such a judgment on the part of the trier of fact? Because the key thing to understand is we're not asking you to second-judge the trier of fact. We want you to take all of the judge's findings of fact that are found on 15.922 of the appendix. We want you to take his understanding that ethanol reduces drying time, that ethanol can serve as a penetration adhesive, that HPMC was intractable. We want you to take the fact that he found that all the prior art would have informed, quote, a person of skill in the art of compatible thickening ages and suitable ranges. We want you to take all those things because those are all true. Given those facts, though, the thing the district court did was it said, well, there's a general unpredictability in the art, and he explained why, but there's a general unpredictability in the art, and that trumps all those factual findings. You're not saying there's no general unpredictability or that the differences were sufficiently small that we would not allow them to accumulate to produce this formulation? Right. The point, I think, is that we don't think that having found these factual findings, you can't just put your thumb on the scale and say, well, there's general unpredictability in the art, and so these factual findings don't matter. What we say is that's improper under this Court's case law. I think I hear you saying you put the thumb on the scale that when it is done for the first time and it turns out that it is an improvement that's not unexpected, and therefore I think it's called hindsight. Therefore, even though we didn't do it, the fact that you did is not protectable. Well, what we would say is not only did we not do it, but the prior art itself showed the exact ranges to use, and so we didn't do it, but neither did Horizon. So the point being is the prior art told us exactly all this. You didn't say exact, but they were close. They were overlapping. Oh, no, they were overlapping. And so, therefore, once there's overlapping amounts of ingredient that's in the prior art, the ranges are in there, then you have a place where it is prima facie obviousness. And now it could well be the case that at the end of the day there was an unexpected result. That is a thing that can happen. The problem is that was not found here. The district court didn't say after looking at all this, oh, here's an interesting unexpected result. He didn't do that, and Horizon acknowledges that fact. He didn't get to that step. So the key is that one has to take these factual findings, use KSR to say, well, now that this range is in the prior art and we know what to do, we do exactly what everybody expected to do, we then have to go to whether or not there's secondary indicia of non-obviousness, for example, commercial success or unexpected results in the art. We'd have to go to that step. The district couldn't do that because it improperly said, I'm going to just rely upon the general unpredictability of the art and also that I'm going to find that the prior art did not predict the exact formulation and dosing frequency. But didn't the district court also find several prior art references that show the unpredictability of changing the formula? He relied heavily upon... The district court did that with respect to Horizon's expert testimony. Well, Horizon's expert testimony largely agrees with us on the factual points that the district court found. If you look at Appendix A-15934... The district court did rely on several prior art references to show the unpredictability of changing the formula. So the district court just didn't say that there's unpredictability in the art. They actually found specific prior art references. Well, I mean, the district court relied heavily upon Dr. Bunge to say why there might be interaction, but there's not... So we agree, Your Honor, that there is unpredictability in the art. I don't think where anybody's fighting upon that. The point being is that you have to use that unpredictability as a factual monitor correctly in the analysis. So what you're not allowed to do is to say, having found all these facts in an activist's favor, I'm going to say it's all trumped by what could have happened, what might have happened, because the art is generally unpredictable. So the point, Your Honor, is not that we're just arguing, oh, this is a very predictable art. No one's saying that. Everyone agrees that this is an unpredictable art. We're just simply saying, as a matter of law, that this court should review de novo, that you have to use those facts in the correct way. And the correct way is that you just need to have a motivation. You should be able to have an obvious to try. All you need is to be pointed in the right direction. You don't need to be told exactly, specifically, this is the amount of different ingredients you should use in the prior. The overlapping ranges is sufficient. And so that's why this is reviewable de novo, and that's why we believe all the district court's factual findings are absolutely correct and in our favor. It's just the application of those facts that deserve to be reviewed. Why don't you turn to the main appeal? So I think the issue that got the most attention was the consisting, essentially, of. Excuse me? That's the one I'd like you to turn to. So the consisting, essentially, of. It's not simply a factual endeavor. You have to figure out what ingredients are allowable and what ingredients are not allowable. And if an ingredient does not change the basic and novel properties of the invention, then you can add it in. If, however, an ingredient would change those properties, then you're not allowed to add it in. And so the whole question is what ingredients you're allowed to add and which ones aren't. And you have to be able to know that ahead of time. A person of skill in the art should not be left to guess until litigation what counts and what doesn't. But if we allow consisting, essentially, of, that inquiry seems insurmountable to me. You have to look out there and say what possibly could materialize. You have to look at all the potential additions you could put in and put them into one bucket or another. How is that doable in any case? Because, Your Honor, it's not that we're asking whether any given ingredient does that. What we're saying is you have to be able to figure out how is one to measure one of these basic and novel properties. For example, say the basic and novel property was it kept down the boiling point or something like that, some number. It made the boiling point below 100 degrees. It then is a question of fact for a fact finder later on to figure out, well, does this make the boiling point go above 100 degrees or not? That's a knowable thing. We can figure it out. But in contrast, let's say one of the basic and novel features of the invention in the patent was it makes the composition aesthetically pleasing. If we were to put something that untestable into the basic and novel features, how would one ever know whether or not an ingredient makes something aesthetically pleasing or not? We don't know. The point being is not that you have to go and say here's the world of things that are allowable and not allowable. Rather, you have to come up with the way that one can actually determine. Now, I would guess that there are several hundred thousand patents out there that use the term consisting essentially of with the full blessing of the examination core as here where this was examined and allowed using this term. One could always argue, as you are, that there's something wrong with this. But I'm not sure that I hear exactly what this is. There is a usage that seems to be so common in these arts and in the art of patent claiming that you think we need to upheave, invalidate the entire cadre of pharmaceutical and other active ingredient products because of a generalized vagueness of consisting essentially of? No, Your Honor. I think that's not correct. All we are simply arguing is that 112 applies to this term like any other term. There will be millions and millions of patents that are perfectly fine, that are entirely definite. There's going to be ones where it's perfectly easy to measure what the novel and. . . So why is this different? They identify, they name the active ingredient. The reason being is because the listing. . . There's two problems. The first is that the listing of novel properties was very, very unclear from the patent. But besides that, we have one of those basic and novel properties being better drying time. And the patent itself is incredibly unintelligible with respect to what it means to actually measure better drying time. Perhaps there was a flaw. Maybe the examiner should have required a little more precision. But at the same time, in terms of standard, reasonably standard examiner objectivity, concentrating on the essential aspects, the active ingredients, the precise limits, but still precisely stated limits of all of the ingredients. What does one do? One disrupts the entire structure of inventing and claiming? No, Your Honor. I think all that we are asking is that 112 be applied. And so the point, I think, Your Honor, is not that. . . It is not actually the case that, for example, better drying time had any way of being figured out based upon what was shown in the specification. In fact, this is much like Dow, the Dow case, wherein there's many different ways that you can measure something. And you'll get different results depending upon how you measure them differently. And so given that fact, the claim is indefinite if it's talking about better drying time. The reason being is not that there's an abstract basic and novel property out there that we need to be able to pin down. The point being is, even given the basic and novel property of better drying time, it's impossible based upon the specification to figure out what the inventor thought that meant or how to measure that. Because there's all different measures. There's the in vivo. There's the in vitro. There's no prior artisan disobligation during the examination process to say that there are these formulations, similar formulations, with drying time problems. Therefore, greater precision is required in your claim. That could be certainly something that an examiner requests. But it isn't done. And it didn't here, but the problem lies in that during prosecution, it has to be remembered that this was added to get around prior art. So there's a quid pro quo here. The horizon could have used consisting of. And if it had decided to use consisting of, that would have been fine. But it would have, of course, excluded a whole lot of different possibly infringing things that would include an additional element. They decided not to do that. They decided to get something broader. They decided to do consisting essentially of, which means that you can add things that don't affect the novel and basic properties of the invention. But in order to get that quid pro quo, you have to do something. And the thing you have to do is specify what these basic and novel properties are. And then on top of it, you have to list ones that are knowable. You can't list aesthetically pleasing. The invention as a whole. I mean, we've got this decades of history of trying to figure out what indeed is fair, what is fair to the public, what is fair to the inventor, what's fair to the competitors. So we have the invention as a whole. We have a formulation that it's undisputed with all of the limitations that are stated in the formulation are not together in one piece of prior art. So the fact that there are consisting essentially of and better drying time, favorable stability, happen to be words that are included in the claim. If they hadn't been included in the claim, we wouldn't have this problem. Your Honor. So why does it hurt them? Because by saying consisting essentially of, they include these basic and novel properties in the claim. The claim scope is defined by those. For example, they were able to say during prosecution, this other prior art doesn't count because it includes something else that could affect the basic and novel properties. So they've defined the claim scope to be narrower based upon during prosecution to exclude all those things. The point being, though, is you have to know where that dividing line is. And it's fair to the public to allow 112 to apply to these because we want to be able to say, what am I allowed to add? And what am I not allowed to add? I would agree if there had, in fact, been references cited and prior art which came to the edge of consisting essentially of. But I don't believe that was the case. Well, Your Honor, I believe that that was the case during the prosecution. If we look at A2430, there was an amendment of the A38 patent that said, here are these two prior art references, Hewitt and Casse. Where are you reading from? I'm sorry. I apologize. This is Appendix 2430. It is during an amendment of 2011. Okay. And it is of the A38 patent. Independent claim 61 has been amended to recite consisting essentially of, thereby limiting the formulation to the basic and novel characteristics of the formulation. As such, the claims exclude the dividing line. The reason that that is problematic, yes, we find that we think that the claim is invalid. And the reason being is because of the basic and novel properties, whatever those are, if one of them includes drawing time, then you can't measure it. And so you can't figure out whether or not, for example, some other prior art would have fallen within the scope of the claim or outside the scope of the claim. And so all we're asking for is that the definiteness be applied in this case like it would in any other case. We have to figure out what the boundaries are. And we can't, if we can't measure where those boundaries are. Okay. Will we have a couple minutes of rebuttal? Your Honor. Your Honor, I'd like to, Your Honor, I'd like to begin with the consisting essentially of. I mean, I think the discussion kind of highlights the problem with activists' challenge here and the problem with the district court's decision is that how you evaluate the basic and novel properties really depends on what is this additional component. And as Chief Judge recognized, there could be innumerable additional components. And so to require the patentee to set forth in the specification every potential objective test that would need to be used to evaluate that fact. So how is the public supposed to know what the meets and bounds are? Your Honor, I submit that the public has ample notice of the scope of the claim based on the language of the claim. The consisting essentially of term enumerates an entire list of components that must be present. And it allows that there can be some additional components which don't materially affect the basic and novel property. And the intrinsic record identifies, we think clearly in this case, what are the basic and novel properties. So the public has notice of what it. Well, that's an assumption. I mean, that's what we're here to find out, right? Whether or not the specification outlines clearly, use the word clearly. That's what we're trying to do, right? We're trying to find out whether it's definite, whether those properties are disclosed in a definite, clear way. So we're all agreeing on that? Well, I guess, Your Honor, I would disagree slightly because what is required of this court's precedence is that you identify what are those properties. And what activists are suggesting is that it's not enough to identify. And so you said minutes ago you identify clearly. Are you taking that back, or is the requirement that you identify clearly what those properties are? No, we submit that what properties must be considered as to whether or not there is a material effect are clearly set forth in the specification. There's no ambiguity about what are the basic and novel properties that must be considered in the factual question. Activists' argument is really based on, and the district court's judgment, is somehow based on taking these properties, now importing them into the claim as if they are part of the language of the claim, and then saying, well, now they're subject to the requirements of Section 112, second paragraph. But the statute requires definiteness of the language of the claims. You can't import the basic and novel properties and the language from the specification into the claims and now say, well, they're also subject to the definiteness requirement. But doesn't the disclosure of those novel and basic properties, even if it's in the specification, require clarity and definiteness? What the law requires is that the type of property to be evaluated in the factual context should be identified in the intrinsic record. But the law has never required that that term, which is assigned to the basic and novel property, in this case there are five, that each of those can now be subject to the requirements of definiteness. Because as the Supreme Court found in Daudelus, now we need to have some sort of objective standard. But to require that, not for the claim language, but with respect to basic and novel properties, which are really outside the scope of the claim that are to be used in the factual context, it doesn't make any sense at all. And this court in PPG found that the question of facts surrounding whether or not an additional component materially affects the basic and novel property is something for the trier of fact. And in that case, PPG argued... Because why? Is that an infringement question? Exactly. That's exactly right. And including the examples that counsel was talking about in the file history, those are fact questions. Is there a prior art composition that is the invention plus one? And does that materially affect the basic and novel properties? That is absolutely a fact question. And the trier of fact can hear that evidence based on however the party with the burden of proof intends to show it by whatever methodology, and they can judge whether that party has met their burden of proof. That is well within the province of the trier of fact. There's no requirement that the specification at the beginning set forth every possible test that would need to be conducted for every hypothetical formulation, in this case, plus one additional component. But then our law requires that the specification have loops and bounds. Your Honor, the law requires the claims have defined... Have loops and bounds. That's right. And the basic and novel properties are not part of the claims. Okay, why don't you move on to the cross appeal for a couple minutes. Sure. So, Your Honor, I have a number of points to make with respect to the 9-1-3 argument. First of all, counsel stood up and made a lot of discussion about how the district court judge erred because he had his thumb on this general unpredictability principle. I submit that that is not actually the argument that they raised in their appeal brief. No. Okay. Well, let's skip that. Sure. Why don't you point me to... I mean, they make some arguments about sort of, I don't like this term, but squishy language in the district court's opinion. So, you heard their argument. They say all of the facts were found on our side in terms of the... And there's just squishy stuff in the district court's opinion. So, what can you point us to in the district court's opinion that's sufficiently clear with regard to his findings on expected results? Well, Your Honor, I think what the problem is with the activist's appeal brief is that they try to take special words and pull them out of context. And it's important to look at the district court judge's opinion as a whole. It's quite lengthy. He heard seven days of trial on one single claim, the twice-daily method of use. And he accepted, as an initial premise, certain of the fact findings that activists had proposed. But, on the whole, what's clear from a reading of his opinion is that he rejected activists' argument of obviousness, because they failed to assess obviousness of the invention as a whole. Instead, activist's expert, Dr. Michniak-Cohen, tried to assess obviousness of each individual change in the context of this results-affected variable case. And what the district court judge was really struck by was the evidence presented by Dr. Bungi that the PennSED formulation is a complex topical formulation. That's a fact finding that he made several times throughout his opinion. If you want, I can give you specific citations. But he accepted it was a complex topical formulation, and he accepted that in a complex topical formulation, such as PennSED, the various components interact with each other. And so that when you made changes to one component, because they had to equal to 100%, it automatically, just as a matter of numbers, required a change to something else. But more importantly, that if you were adding, for example, ethanol, because you thought it was going to enhance penetration of the drug deep into the tissue to affect the pain of osteoarthritis, that that hopeful result could be adversely affected by changes in the other components. And indeed, Dr. Bungi, in her direct testimony, cited innumerable examples in the exact prior art that Dr. Michniak-Cohen was attempting to rely on, that instead of showing predictability, to the contrary showed that the general principle that she argued would hold true, never did. And even Fick's law, as soon as you had more than a two-component system, it no longer held true, that actually you get the opposite result. So the district court judge's opinion is really based on a finding that activists failed to assess obviousness of the combination of changes. Instead, they prefer to analogize it to the stereo receiver, imagining that each dial could be turned independently, and that was not at all the case. So his holding ultimately is that in the context of that fact question, which was a complex topical formulation, that you could not predict what the result would be if you adjusted one component, because every time you changed one thing, it would affect everything else. He further found that there was complexity in the skin environment, and that the interaction of the various components in the formulation, while interacting with each other, would also interact with skin in unpredictable ways. Okay. Thank you. Thank you, Your Honor. Your Honor, one thing I need to address with regard to the cross-appeal is that counsel suggested the district court found that these different components actually caused some unexpected result. The district court didn't get to that point. That's the key issue, is the district court said, quote, on a 15- I thought what she was saying was you change one component and it could affect the other component. It's not a stagnant process. And that's correct. It could have. The point being, of course, it didn't. If you added thickener, it thickens the formula. If you added ethanol, it made it drier. It actually worked as expected. Now, yes, it could be, because it is complex and this is a complex field, that there is some theoretical way that it might have adversely impacted. Maybe. The point being, though, is we don't need that in law. We don't need to know exactly what's going to happen if you add a given ingredient. All you need to have in our case are some motivation, some reason, some reasonable expectation of success, not a clear and unambiguous expectation of success. And the point there is the district court never once said anything was actually unexpected, just that you could, might be, because it's complex. The problem then, again, is that every single formula under Horizon's definition is complex. Every single thing involves more than just water in the active ingredient. And so, of course, if that's the case, then every formulation is per se non-obvious, which can't be the law. Thank you.